**Dr. Douglas R. FINGOLD, Appellant,**

v.

**David K. COOK, Appellee.**

No. 01–94–00063–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 30, 1995.

Rehearing Overruled May 18, 1995.

Robert M. Crain, Richard S. Browne, Houston, for appellant.

Roland Garcia, Jr., Houston, for appellee.

Before COHEN, MIRABAL and HUTSON–DUNN, JJ.

**OPINION ON REHEARING**

HUTSON–DUNN, Justice.

We overrule appellee's motion for rehearing, withdraw our opinion of February 16, 1994, and substitute this opinion in its stead.

Appellee, David Cook (seller), sued appellant, Douglas Fingold (buyer), for breach of an earnest money contract, demanding the release of $1,000 in earnest money. Buyer filed an answer and counterclaimed alleging that he had the right to the money. The case was tried to a jury; however, the trial court granted seller's motion for directed verdict on the case and submitted the question of attorney's fees to the jury. The jury awarded seller $32,000 in attorney's fees plus further fees if the case was appealed. Buyer moved for remittitur of the attorney's fees which was denied. Buyer brings four points of error.

Under point of error one, buyer argues that the trial court erred in granting the directed verdict because there is a fact issue regarding breach of the earnest money contract.

■■■ In reviewing a record on appeal in which a verdict has been directed, this Court must view the evidence in the light most favorable to the party against whom the verdict was rendered and disregard all contrary evidence and inferences. *Qantel Business Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 303 (Tex.1988). Where there is conflicting evidence of probative value in the record, a directed verdict is error and the case must be remanded for a jury determination. *Id.* at 304. Buyer argues that there is a fact issue concerning whether his conduct breached the earnest money contract.

"Agreed Stipulations of Fact" were read into evidence before the jury. The stipulations, and other evidence, showed the following.

The July 11, 1990, earnest money contract provided for buyer to obtain third party financing of $63,450 due in full in 30 years, payable in monthly payments of principal and interest, with interest not exceeding 10 percent per annum. It states that buyer shall "make every reasonable effort" to obtain such financing and if not obtained, the earnest money would return to buyer. July 31, 1990, was the specified closing date set out in the contract; subsequently there were three agreed-on extensions of the closing date.

Pursuant to the terms of the contract, buyer timely applied for third-party financing on the terms required by the earnest money contract (30 years at 10% fixed rate interest in the principal amount of $63,450). On August 15, buyer learned that his application was denied. The final closing date for the contract agreed upon by the parties was August 22, 1990.

Buyer did not apply for third-party financing again on the same terms. However, prior to August 22, buyer was offered and agreed to accept, through the same mortgage company, a loan in the amount of $52,850, payable in 30 years at a fixed interest rate beginning at 10 percent per annum; buyer intended to pay the balance of the purchase price in cash at the closing. The only apparent difference in terms was that the loan amount was $10,600 less than the loan described in the earnest money contract. Seller was never informed of buyer's alternate financing plan prior to August 22.

Buyer was notified on August 22, by the closer at the title company, that his loan had been funded by the mortgage company. On that same day, buyer appeared at the title company to close on the purchase. The lender had wired the net amount of the loan funds to the title company for the closing, and buyer had the down payment with him. However, after reading the documents from the financing company that were first presented to buyer at closing, buyer found the loan amount was $52,850, payable in *15 years*, bearing interest at a *variable rate* beginning at *10.75%* per annum. Buyer stipulated that he did not refuse to close because of the three significantly different disadvantageous terms (a lower loan amount, a shorter term, and an interest rate that was .75% higher and variable rather than fixed). Rather, he stipulated that he refused the loan presented by the mortgage company because of the wording of a conversion option in the loan that was not worded as previously represented by the mortgage company. The "Adjustable Rate Note" stated that the interest rate may change "on the first day of December 1, 1990 and on the first day of every third month thereafter (i.e. June 1, September 1, December 1, and March 1)."

Buyer was granted an option to convert to a fixed rate according to the following terms:

5. FIXED INTEREST RATE CONVERSION OPTION

(A) Option to Convert to Fixed Rate

I have a Conversion Option that I can exercise unless I am in default or this Section 5(A) will not permit me to do so. The "Conversion Option" is my option to convert the interest rate I am required to pay by the Note from an adjustable rate with interest rate limits to the fixed rate calculated under Section 5(C) below.

The conversion option can take place on any payment date after the first payment date, subject to the notice requirements described below. Each date on which my adjustable interest rate can convert to the new fixed rate is called the "Conversion Date."

In order to exercise the Conversion Option, I must first meet certain conditions. These conditions are: (i) I must give the Note Holder written notice 45 days prior to my intent to exercise the Conversion Option; (ii) I must not be in default under the Note or Security Instrument on the Conversion Date; (iii) I must pay the Note Holder by a date specified by the Note Holder, a Conversion fee of $500.00; (iv) I must sign and give the Note Holder, by a date specified by the Note Holder, any documents the Note Holder requires to effect the conversion; and (v) I must qualify for the converted loan based on my general creditworthiness as if I was applying for a fixed rate mortgage with similar terms.

(B) Determination of Conforming and Non–Conforming Loans

If the outstanding principal balance of my Note, at the time I give notice to the Note Holder of my intent to exercise the Conversion Option, conforms to the Federal National Mortgage Association's (FNMA) then current maximum loan limits, my loan is a "Conforming Loan". However, if the outstanding principal balance on my Note, at the time I give notice to the Note Holder of my intent to exercise the Conversion Option, exceeds the then current maximum loan limits of the Federal National Mortgage Association (FNMA), my loan is a "Non–Conforming Loan". The terms, Conforming and Non–Conforming Loans as defined in this paragraph, refer to the maximum allowable loan amounts established by the Federal National Mortgage Association.

(C) Calculation of Fixed Rate

If my outstanding principal balance, as described above, is a Conforming Loan, my fixed interest rate will be equal to the Federal National Mortgage Association's required net yield as of a date and time specified by the Note Holder for ... 15–year fixed rate mortgages covered by applicable 60–day mandatory delivery commitments, plus five-eighths of one percentage point (0.625%), rounded to the nearest one-eighth of one percentage point (0.125%). If this required net yield cannot be determined because the applicable commitments are not available, the Note Holder will determine the interest rate by using comparable information. My new fixed interest rate calculated under this Section 5(C) will not be greater than the Maximum Rate stated in Section 4(D) above.

If any outstanding principal balance, as described above, is a Non–Conforming Loan, my fixed interest rate will be five-eighths of one percentage point (0.625%) over the mandatory delivery rate generally required by the secondary market for non-conforming loans with similar maturities, rounded to the nearest one-eighth of one percentage point (0.125%). If there is no secondary market for non-conforming loans of similar maturities, the Note Holder reserves the right to deny a conversion request.

Buyer refused the loan due to the wording of the conversion option that was not worded as previously represented by the mortgage company. Accordingly, buyer did not close on the contract. Seller was not at closing but was notified. Seller refused to further extend the closing date and demanded release of the earnest money, which buyer refused.

Buyer argues that his attempt to get the financing called for in the contract created a fact issue concerning whether he breached the contract.

Seller responds first that buyer breached the earnest money contract as a matter of law because his reason for refusing to close—he did not like the wording of the conversion option in his loan—was not one provided for by the contract. We disagree. The conversion option directly affected the interest rate chargeable under the loan, and the terms were not acceptable to buyer.

Seller cites *Greve v. Cox*, 683 S.W.2d 535, 537 (Tex.App.—Dallas 1984, no writ), for the proposition that buyer breached the contract as a matter of law because he was approved for financing but did not close. *Greve* is distinguishable. In that case the evidence showed that the buyer obtained the financing called for in the earnest money contract. *Id.* In this case, the buyer did not secure the required financing.

Seller argues next that buyer failed to make "every reasonable effort" to obtain the contract's required financing as a matter of law since he only applied once for the required financing. Whether a buyer has used reasonable efforts to procure the financing called for in an earnest money contract is usually a question of fact for the jury. *Stegman v. Chavers*, 704 S.W.2d 793, 796 (Tex. App.—Dallas 1985, no writ). However, seller argues that buyer waived any defense that he could not obtain the specific financing required by the contract by arranging for financing on terms different than those stated in the contract, citing *Smith v. Evans*, 620 S.W.2d 627, 628 (Tex.Civ.App.—Dallas 1981, no writ). *Smith* is distinguishable because in that case the buyer *never* made application for the type of loan required by the earnest money contract. *Id.* This made it impossible to determine whether a loan on the specified terms would have been approved by a lender. *Id.* That is not the case here, where buyer's application on the specified terms was denied. However, seller argues that *Smith* is applicable because buyer in the present case did not make a reasonable effort to obtain the correct financing after his correct loan application was rejected by one mortgage company.

The earnest money contract was dated July 11, 1990. The original closing date was July 31, 1990, and the final extended closing date was *August 22.* Buyer timely applied for the financing required by the earnest money contract; he was not informed of the loan denial until August 15. Through the same mortgage company he obtained loan approval on terms less favorable than called for in the earnest money contract. Buyer declined to accept the loan, and seller refused to further extend the closing date past August 22.

The fact that buyer was willing to borrow the purchase money on less advantageous terms than called for in the earnest money contract did not, alone, constitute a breach of contract. *Herbage v. Snoddy*, 864 S.W.2d 695, 700 (Tex.App.—Houston [1st Dist.] 1993, writ denied). Viewing the evidence in the light most favorable to buyer, we find there is a fact issue regarding whether buyer used "reasonable efforts" to obtain the financing described in the earnest money contract.

We sustain point of error one.

In light of our decision, it is unnecessary for us to address buyer's remaining points of error.

We reverse the judgment and remand to the trial court for further proceedings.